2016V01954/SD/BAW/ms

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED
2016 SEP 26 P 9: 46

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

          Plaintiff,

              v.

1. ALL FUNDS IN THE ACCOUNTS OF
   BLUE SEA BUSINESS CO., LTD.,
   FANWELL, LTD., FULLY MAX
   TRADING, LTD., DANDONG
   HONGXIANG INDUSTRIAL
   DEVELOPMENT CO., LTD., AND
   SUCCESS TARGET GROUP, LTD. AT
   CHINA MERCHANTS BANK, ACCOUNT
   NUMBER XXXXXXXXXXXX632-601,
   XXXXXXXXXXXXXX2-108,
   XXXXXXXXXXXX032-601,
   XXXXXXXXX5-001,
   XXXXXXXXXXXXXX2-105, OR ANY
   PROPERTY TRACEABLE THERETO;

2. ALL FUNDS IN DANDONG
   HONGXIANG INDUSTRIAL
   DEVELOPMENT CO., LTD.'S
   ACCOUNTS AT AGRICULTURAL BANK
   OF CHINA, IN ACCOUNT  NUMBER
   XXXXXXXXXXXXX0-127,
   XXXXXXXXXXXXX0-050, OR ANY
   PROPERTY TRACEABLE THERETO;

3. ALL FUNDS IN CARBUNCLE
   BUSINESS CO., LTD.'S ACCOUNTS AT
   SHANGHAI PUDONG DEVELOPMENT
   BANK, ACCOUNT NUMBER
   XXXXXXXXXXXXXX1-191, OR ANY
   PROPERTY TRACEABLE THERETO;

4. ALL FUNDS IN DANDONG
   HONGXIANG INDUSTRIAL

Civil Action No.

:

**VERIFIED COMPLAINT**
**FOR FORFEITURE IN REM**

:

DEVELOPMENT CO., LTD.'S
ACCOUNTS AT BANK OF
COMMUNICATIONS CO. OF CHINA,
ACCOUNT NUMBER
XXXXXXXXXXXXXXXXX4-881, OR
ANY PROPERTY TRACEABLE
THERETO;

5. ALL FUNDS IN DANDONG
HONGXIANG INDUSTRIAL
DEVELOPMENT CO., LTD.'S
ACCOUNTS AT BANK OF DANDONG,
ACCOUNT NUMBER XXXXXXXXXXX0-
557, XXXXXXXXXXX0-573,
XXXXXXXXXX5-555, XXXXXXXXXX7-
777, OR ANY PROPERTY TRACEABLE
THERETO;

6. ALL FUNDS IN DANGDONG
HONGXIANG INDUSTRIAL
DEVELOPMENT CO., LTD.'S
ACCOUNTS AT CHINA
CONSTRUCTION BANK, ACCOUNT
NUMBER XXXXXXXXXXXXXXXX0186,
XXXXXXXXXXXXXXXX0267, OR ANY
PROPERTY TRACEABLE THERETO;

7. ALL FUNDS IN DANDONG
HONGXIANG INDUSTRIAL
DEVELOPMENT CO., LTD.'S
ACCOUNTS AT GUANGDONG
DEVELOPMENT BANK, ACCOUNT
NUMBER XXXXXXXXXXXXXX0158,
OR ANY PROPERTY TRACEABLE
THERETO;

8. ALL FUNDS IN DANDONG HONGXIANG
INDUSTRIAL DEVELOPMENT CO.,
LTD.'S ACCOUNTS AT INDUSTRIAL
AND COMMERCIAL BANK OF CHINA,
ACCOUNT NUMBER
XXXXXXXXXXXXXX9-105, OR ANY
PROPERTY TRACEABLE THERETO;

2

9. ALL FUNDS IN DANDONG HONGXIANG
   INDUSTRIAL DEVELOPMENT CO.,
   LTD.'S ACCOUNTS AT BANK OF
   DALIAN, ACCOUNT NUMBER
   XXXXXXXXXXX2005, OR ANY
   PROPERTY TRACEABLE THERETO;

10. ALL FUNDS IN DANDONG
    HONGXIANG INDUSTRIAL
    DEVELOPMENT CO., LTD.'S
    ACCOUNTS AT BANK OF JINZHOU,
    ACCOUNT NUMBER
    XXXXXXXXXXX5252,
    XXXXXXXXXXX3790,
    XXXXXXXXXXX9334,
    XXXXXXXXXXX9666, OR ANY
    PROPERTY TRACEABLE THERETO;

11. ALL FUNDS IN DANDONG
    HONGXIANG INDUSTRIAL
    DEVELOPMENT CO., LTD.'S
    ACCOUNTS AT HUA XIA BANK,
    ACCOUNT NUMBER
    XXXXXXXXXXXX4470,
    XXXXXXXXXXXX9901, OR ANY
    PROPERTY TRACEABLE THERETO;
    AND

12. ALL FUNDS IN DANDONG
    HONGXIANG INDUSTRIAL
    DEVELOPMENT CO., LTD.'S
    ACCOUNTS AT CHINA MINSHENG
    BANKING CORPORATION, ACCOUNT
    NUMBER XXXXX0828, OR ANY
    PROPERTY TRACEABLE THERETO.

Defendants in rem.
-------------------------------------------------- x

Plaintiff, United States of America, by and through its undersigned

attorneys, brings this verified complaint in a civil action *in rem* to condemn and

forfeit the above-listed defendant property to the use and benefit of the United

3

States of America in accordance with Rule G of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions. In support of its cause, Plaintiff states and alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.    This is a civil forfeiture action *in rem* to forfeit all funds in 25 bank accounts located in China (the "defendant property") that were involved in a conspiracy to commit a money laundering offense in violation of 18 U.S.C. § 1956(h). The object of the conspiracy to commit a money laundering offense was to evade United States ("U.S.") economic sanctions issued under the International Emergency Economic Powers Act of 1977 ("IEEPA"), 50 U.S.C. §§ 1701-1706. These funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. §§ 1345 and 1355(a).

3.    Venue for this action is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture took place in the District of New Jersey. Additionally, although the property subject to forfeiture is located in a foreign country—to wit, the People's Republic of China ("China")—venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(2) because acts or omissions giving rise to the forfeiture took place in the District of New Jersey.

## SUMMARY OF CLAIMS

4

4.     As set out in more detail below, multiple Chinese nationals conspired to evade United States economic sanctions using a Dandong, China-based trading company and several of its front companies, by facilitating monetary transactions in U.S. dollars through the U.S. on behalf of at least one, and possibly more, sanctioned entities in the Democratic People's Republic of Korea ("DPRK" or "North Korea"), and thereafter laundering the proceeds of that criminal conduct, including in and through U.S. financial institutions.

5.     Following the designation of Korea Kwangson Banking Corporation ("KKBC") as a Specially Designated National ("SDN") by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), Ma Xiaohong ("MA"), a Chinese national and the majority owner of the China-based trading company Dandong Hongxiang Industrial Development Co., Ltd., ("DHID"), conspired with other senior managers working for DHID to create or acquire numerous front companies that were used to conduct financial transactions designed to evade U.S. sanctions related to certain North Korean entities. Specifically, the front companies facilitated transactions funded by and/or guaranteed by KKBC after its designation as an SDN by OFAC on August 11, 2009, pursuant to Executive Order ("E.O.") 13382. At times, DHID and its front companies managed the full logistical chain of commodity contracts, to ensure the performance and payment of specific purchases in U.S. dollars that were in fact guaranteed by SDN KKBC for North Korea-based entities, but were prohibited by OFAC regulations. At other times, DHID and its front companies served as financial

5

intermediaries for U.S.-dollar transactions between North Korean-based entities and suppliers in other countries in order to evade U.S. sanctions.

6. To facilitate this conduct, MA, DHID, and officers and employees of DHID used front companies to establish numerous bank accounts at various banks in China. As set out in more detail below, following KKBC's August 11, 2009 designation by OFAC, these front companies and their related accounts were involved in a money laundering scheme that allowed DHID and its officers to evade U.S. economic sanctions by conducting transactions through the U.S. on behalf of KKBC. For the reasons set out below, all of the defendant property associated with DHID and its front companies is forfeitable to the United States as property involved in money laundering.

7. As part of their overall scheme, DHID, MA and DHID employees repeatedly engaged in international money laundering in violation of 18 U.S.C. § 1956(a)(2) and a conspiracy to engage in international money laundering in violation of 18 U.S.C. § 1956(h). Specifically, DHID and its front companies repeatedly transported, transmitted, and transferred funds from a place outside the U.S. to or through a place inside the U.S., and from a place inside the U.S. to or through a place outside the U.S. (i) with the intent to promote the carrying on of specified unlawful activity, to wit, a violation of IEEPA; (ii) knowing that the funds involved in the transportation, transmission and transfer represented some form of unlawful activity; and (iii) knowing that the transportation, transmission and transfer were designed in whole or part to conceal or disguise the nature, the location, the source, the ownership, or the

6

control of the proceeds of a specified unlawful activity, in this case violations of IEEPA. The DHID front companies were established to enable the transfer and transmittal of funds into and out of the U.S. in violation of IEEPA and to conceal that the funds were the proceeds of an IEEPA violation. DHID and its front companies played such a substantial role in these money laundering violations that DHID and its front companies are forfeitable to the U.S. as property involved in money laundering. As a result, all of the assets of DHID and its front companies, including the defendant property, are forfeitable to the U.S. pursuant to 18 U.S.C. § 981(a)(1)(A).

## NATURE OF DEFENDANTS *IN REM*

8.     The defendant property includes all funds in the relevant accounts located at financial institutions in China. The following bank accounts are controlled by five DHID-front companies that received proceeds of the IEEPA violations identified herein, as well as other funds that transited through the U.S. As a result, these funds are forfeitable as being involved in money laundering conspiracy:

(a) All funds in the accounts of Blue Sea Business Co., Ltd., Fanwell, Ltd., Fully Max Trading, Ltd., and Success Target Group, Ltd. at China Merchants Bank, account number XXXXXXXXXXXX632-601, XXXXXXXXXXXXXX2-108, XXXXXXXXXXXXX032-601, XXXXXXXXXXXXXX2-105, or any property traceable thereto; and

(b) All funds in Carbuncle Business Co., Ltd.'s accounts at Shanghai Pudong Development Bank, account number XXXXXXXXXXXXXX1-191, or any property traceable thereto.

9.     DHID's bank accounts were also directly involved in the IEEPA and money laundering conspiracies. During the course of the IEEPA and

7

money laundering conspiracies alleged in this Verified Complaint for

Forfeiture, the DHID accounts listed below received a total of $74,377,708.00

that transited through the U.S., including $15,631,152.96 from the five DHID

front companies directly involved in the IEEPA violations identified herein. As

a result, these funds are forfeitable to the U.S. for being involved in a money

laundering conspiracy:

(c) All funds in Dandong Hongxiang Industrial Development Co., Ltd.'s accounts at Agricultural Bank of China, account number XXXXXXXXXXXXX0-127, XXXXXXXXXXXXX0-050, or any property traceable thereto;

(d) All funds in Dandong Hongxiang Industrial Development Co., Ltd.'s accounts at China Merchants Bank, account number XXXXXXXXX5-001, or any property traceable thereto;

(e) All funds in Dandong Hongxiang Industrial Development Co., Ltd.'s accounts at Bank of Communications Co. of China, account number XXXXXXXXXXXXXXXX4-881, or any property traceable thereto;

(f) All funds in Dandong Hongxiang Industrial Development Co., Ltd.'s accounts at Bank of Dandong, account number XXXXXXXXXXX0-557, XXXXXXXXXXX0-573, XXXXXXXXXX5-555, XXXXXXXXXX7-777, or any property traceable thereto;

(g) All funds in Dangdong Hongxiang Industrial Development Co., Ltd.'s accounts at China Construction Bank, account number XXXXXXXXXXXXXXXX0186, XXXXXXXXXXXXXXXX0267, or any property traceable thereto;

(h) All funds in Dandong Hongxiang Industrial Development Co., Ltd.'s accounts at Guangdong Development Bank, account number XXXXXXXXXXXXXX0158, or any property traceable thereto; and

(i) All funds in Dandong Hongxiang Industrial Development Co., Ltd.'s accounts at Industrial and Commercial Bank of China, account number XXXXXXXXXXXXXXX9-105, or any property traceable thereto.

8

In addition, the following DHID accounts essentially stood behind the DHID

front companies, funding the five DHID front companies involved in the

specific IEEPA and money laundering transactions in the amounts listed

below and are, as a result, forfeitable to the U.S. for being involved in a money

laundering conspiracy:

(j) All funds in Dandong Hongxiang Industrial Development
Co., Ltd.'s accounts at Bank of Dalian, account number
XXXXXXXXXXX2005; or any property traceable thereto;

(k) All funds in Dandong Hongxiang Industrial Development
Co., Ltd.'s accounts at Bank of Jinzhou, account number
XXXXXXXXXXX5252, XXXXXXXXXXX3790, XXXXXXXXXXX9334,
XXXXXXXXXXX9666, or any property traceable thereto;

(l) All funds in Dandong Hongxiang Industrial Development
Co., Ltd.'s accounts at Hua Xia Bank, account number
XXXXXXXXXXXXX4470, XXXXXXXXXXXXX9901; and

(m) All funds in Dandong Hongxiang Industrial Development
Co., Ltd.'s accounts at China Minsheng Banking Corporation, account
number XXXXX0828, or any property traceable thereto.

10. The defendant property is located in China. As recently as June,

July and August of 2016, nearly $8 million has transited through U.S.

correspondent bank accounts related to three DHID front companies

discussed in paragraph 20 below.

## RELEVANT INDIVIDUALS AND ENTITIES

11. At all times relevant to this Complaint, the following individuals

and entities were involved in the scheme to evade U.S. sanctions under IEEPA

and to commit international money laundering.

9

12. **Korea Kwangson Banking Corporation ("KKBC")** is a bank with an address of "Jungson-dong, Sungri Street, Central District, Pyongyang, Korea, North," and has operated at least one overseas banking branch in Dandong, China. Historically, KKBC has provided financial services in support of designated entities in North Korea, including Tanchon Commercial Bank and Korea Ryonbong General Corporation, both of which were listed in the Annex to E.O. 13382 (further described below), which was issued in June 2005.

13. **Liaoning Hongxiang Industrial Group ("LIAONING HONGXIANG")** is a China-based holding company that operates as a parent company to a series of businesses including DHID. Most of the companies associated with LIAONING HONGXIANG likewise use "Dandong Hongxiang" as part of their name and include such companies as Dandong Hongxiang International Freight Forwarders, Dandong Hongxiang Travel Agency, and Dandong Hongxiang Real Estate, among others.

14. **Dandong Hongxiang Industrial Development Co., Ltd. ("DHID")** is a China-based trading company that specializes in trade with North Korea. It was formed in or about January, 2000. It is based in Dandong, China, one of the largest Chinese cities on the border with North Korea.

15. **Ma Xiaohong ("MA")** is an approximately 45-year-old Chinese national who resides in Dandong, China. She is the majority (80%) shareholding owner of DHID. She is also listed as the CEO and/or director of several of the DHID front companies discussed herein.

10

16. **Zhou Jianshu ("ZHOU")** is the general manager of DHID and worked directly for MA. He is approximately 45 years old and resides in Dandong, China. ZHOU, at times coordinating with other DHID employees, established or acquired numerous front companies associated with DHID that were used to transact business in U.S. dollars on behalf of KKBC, which cleared through the U.S. banking system. ZHOU incorporated several of the front companies discussed herein using his own personal identifying information and appears as the director for several of those companies.

17. **LUO Chuanxu ("LUO")** is a financial manager at DHID and served as an assistant to MA and ZHOU. LUO is approximately 30 years old and resides in Dalian, China. LUO was associated with several of the front companies discussed herein that conducted U.S. dollar transactions for North Korea-based entities. LUO was also involved in making payments to vendors who supplied commodities to the DPRK and was named CEO and/or sole shareholder of at least two of the front companies established on behalf of DHID.

18. **HONG Jinhua ("HONG")** is the deputy general manager of DHID and worked directly for MA. HONG is approximately 44-years-old and resides in Dandong, China. HONG managed U.S.-dollar bank accounts, some of which were held at KKBC, on behalf of DHID and its front companies. HONG was associated with some of the front companies using her own personal

11

identifying information and appears as the director for some of those
companies.

19.    The following front companies were created or purchased by DHID
and its executives.  These front companies transmitted and/or received money
through the U.S. as part of a money laundering conspiracy, and are directly
linked to transactions involving KKBC that violate IEEPA and money
laundering laws.  The bank accounts belonging to these companies, along
with DHID, are identified above as the defendant property:

> a.  Blue Sea Business Co., Ltd. was registered in Wales.  Its CEO
> and/or director is MA.  Its address is LA Bldg., 66 Corporation
> Road, Cardiff, S. Glam CF11 7AW, Wales.  Blue Sea Business
> Co., Ltd. was owned or controlled by DHID at least as of
> August 13, 2009.

> b.  Carbuncle Business Co., Ltd. was registered in England.  Its
> CEO and/or director is MA and its address is 18A Lanchester
> Way, Daventry, Northants NN11 8PH, England.  Carbuncle
> Business Co., Ltd. was owned or controlled by DHID at least as
> of August 19, 2009.

> c.  Fanwell, Ltd. was incorporated in Hong Kong on or about
> January 8, 2010.  ZHOU is its director.  Its address is Room
> 1502, 15/F Keen Hung Commercial Building, 80 Queen's Road
> East, Wanchai, Hong, Kong.

12

d. <u>Fully Max Trading, Ltd.</u> was established in the BVI. Its director and/or sole shareholder is an individual, who upon information and belief is a relative of MA's and a DHID employee. Its address is Akara Bldg., 24 De Castro Street, Wickhams Cay I, Road Town, Tortola, BVI. Fully Max Trading, Ltd. was owned or controlled by DHID at least as of September 4, 2012.

e. <u>Success Target Group, Ltd.</u> was established in the BVI on or about January 21, 2011 and purchased by DHID on or about July 4, 2011. Its CEO and/or sole shareholder is LUO. Its address is Akara Bldg., De Castro Street, Wickhams Cay I, Road Town, Tortola, BVI.

20. The following front companies were created or purchased by DHID and its executives and transmitted and/or received money through the U.S. on behalf of DHID as part of the money laundering conspiracy:

a. <u>Beauty Chance (HK), Ltd.</u> was established in Hong Kong on or about October 8, 2010. It was purchased by DHID on or about January 11, 2011. Its address is Room 1502, 15/F Keen Hung Commercial Building, 80 Queen's Road East, Wanchai, Hong, Kong. LUO is its director.

13

b. Best Famous Trading, Ltd. was established in the BVI on or about January 20, 2011. It was purchased by DHID on or about July 4, 2011. LUO is its CEO and/or sole shareholder.

c. Deep Wealth Ltd. was established in Anguilla. Its address is 25 Mason Complex, Stoney Ground the Valley, Anguilla. Deep Wealth Ltd. was owned or controlled by DHID at least as of June 10, 2015.

d. Flying Horse (HK), Ltd. was incorporated in Hong Kong on or about December 15, 2010 and purchased by DHID on or about January 11, 2011. Its director is a DHID employee. Its address is Room 1502, 15/F Keen Hung Commercial Building, 80 Queen's Road East, Wanchai, Hong, Kong.

e. Go Tech Investment, Ltd. was established in the Seychelles on or about May 23, 2011, and purchased by DHID on or about July 4, 2011. Its CEO and/or sole shareholder is an individual, who upon information and belief is a relative of MA's and a DHID employee.

f. Good Field Trading, Ltd. was established in Hong Kong on or about December 24, 2010. Its director is HONG. Its address is Room 1502, 15/F Keen Hung Commercial Building, 80 Queen's Road East, Wanchai, Hong, Kong.

14

g. <u>Hong Kong Golden Ball Development, Ltd.</u> was established in Hong Kong on or about May 8, 2013. Its director is an individual, who upon information and belief is a relative of MA's and a DHID employee. Its address is Room 1502, 15/F Keen Hung Commercial Building, 80 Queen's Road East, Wanchai, Hong, Kong.

h. <u>Hong Kong Hugo Development, Ltd.</u> was established in Hong Kong on or about May 8, 2013. Its director is MA. Its address is Room 1502, 15/F Keen Hung Commercial Building, 80 Queen's Road East, Wanchai, Hong, Kong.

<u>Hong Kong Win Dragon Development, Ltd.</u> was established in Hong Kong on or about May 8, 2013. Its director is an individual, who upon information and belief is a relative of MA's and a DHID employee. Its address is Room 1502, 15/F Keen Hung Commercial Building, 80 Queen's Road East, Wanchai, Hong, Kong.

i. <u>Hong Xiang Industrial Development (H.K.) Ltd.</u> was established in Hong Kong on or about May 25, 2012. Its directors are an individual, who upon information and belief is a relative of MA's, and Sheen Fair Trading, Ltd., another front company owned by DHID. Its address is Room 1502, 15/F Keen Hung

15

Commercial Building, 80 Queen's Road East, Wanchai, Hong, Kong.

j. <u>Jiajia Holdings, Ltd.</u> was established in Hong Kong on or about December 11, 2009. Its director is ZHOU. Its address is Unit A (Rm. 9) 3/F Cheong Sun Tower, 116-118 Wing Lok Street, Sheung Wan, Hong Kong.

k. <u>MK Vista Shipping & Business Co., Ltd.</u> was established in Hong Kong on or about November 26, 2010. Its director is MA. Its address is D8024 Rm. 1005 10/F Ho King Comm Centre 2-16 Fa Yuen Street Mongkok KLN, Hong Kong.

l. <u>Nation Good (H.K.), Ltd.</u> was established in Hong Kong on or about April 11, 2012. Its directors are an individual, who upon information and belief is a relative of MA's and a DHID employee, and Fully Max Trading, Ltd., another DHID front company. Its address is Room 1502, 15/F Keen Hung Commercial Building, 80 Queen's Road East, Wanchai, Hong, Kong.

m. <u>Nice Field International, Ltd.</u> was established in Hong Kong on or about November 12, 2010. Its director is HONG. Its address is Room 1502, 15/F Keen Hung Commercial Building, 80 Queen's Road East, Wanchai, Hong, Kong.

n. Sheen Fair Trading, Ltd. was established in the BVI. Its director and/or sole shareholder is an individual, who upon information and belief is a relative of MA's and a DHID employee. Its address is Akara Bldg., De Castro Street, Wickhams Cay I, Road Town, Tortola, BVI. Sheen Fair Trading, Ltd. was owned or controlled by DHID at least as of July 30, 2013.

o. Unique One Development, Ltd. was established in the Seychelles on or about April 18, 2011 and purchased by DHID on or about July 4, 2011. Its CEO and/or sole shareholder is an individual, who upon information and belief is a relative of MA's and a DHID employee. Its address is Suite 13, First Floor, Oliaji Trade Centre, Francis Rachel Street, Victoria, Mahe, Republic of Seychelles.

p. Win Trade Worldwide Ltd. was established in Hong Kong on or about December 23, 2008. Its director is ZHOU. Its address is Room 1502, 15/F Keen Hung Commercial Building, 80 Queen's Road East, Wanchai, Hong, Kong.

21. In addition to the above entities, as part of the ongoing scheme, the conspirators transmitted U.S. dollars through, among others, correspondent banking accounts maintained at the following financial institutions in the state of New Jersey:

17

     a. Standard Chartered Bank is a multinational bank with offices in the U.S. Standard Chartered Bank maintains an operations center in Newark, New Jersey that processes all of the bank's U.S. dollar wire transfers.

     b. Deutsche Bank AG is a multinational bank with offices in the U.S. Deutsche Bank Trust Company America maintains an operations center in Jersey City, New Jersey that processes all of the bank's U.S. dollar wire transfers.

## WEAPONS OF MASS DESTRUCTION PROLIFERATORS

22.    The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1701, et seq., authorized the President of the United States to impose economic sanctions in response to unusual and extraordinary threats to the national security, foreign policy, and economy of the U.S. when the President declares a national emergency with respect to that threat.

23.    On November 14, 1994, the President issued Executive Order ("E.O.") 12938 finding that "the proliferation of nuclear, biological and chemical weapons ("weapons of mass destruction") and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

24.    On June 28, 2005, pursuant to IEEPA and the National Emergencies Act, the President issued E.O. 13382, which takes additional

18

steps with respect to the national emergency described and declared in E.O. 12938, to target proliferators of weapons of mass destruction ("WMD") and their support networks and deny designated WMD proliferators access to the U.S. financial and commercial system. As part of E.O. 13382, a number of North Korean entities were identified by the President as WMD proliferators and listed in the Annex to E.O. 13382 as being subject to U.S. sanctions.

25.   On April 13, 2009, the U.S. Department of the Treasury promulgated the Weapons of Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. § 544, et seq., (the "WMDPSR"), which blocked, as a function of law, any property and interests of property, belonging to sanctioned individuals and entities ("Specially Designated Nationals" or "SDNs"), who were placed on OFAC's Specially Designated Nationals and Blocked Persons List (the "SDN list"), see 31 C.F.R. § 544.201(a). The terms "property" and "property interests" include but are not limited to money, bank deposits, guarantees, and other financial instruments, see 31 C.F.R. § 544.308.

26.   The WMDPSR prohibited transactions or dealings by any U.S. person or within the U.S. with individuals and entities who have been placed on the SDN list, except as authorized or licensed by OFAC, see 31 C.F.R. § 544.201. In addition, the WMDPSR also prohibited any transaction by a U.S. person or within the U.S. that evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in the WMDPSR, see 31 C.F.R. § 544.205.

19

27.    Pursuant to the WMDPSR, 31 C.F.R. § 544.405(a), the prohibitions on transactions involving the SDN listed entities contained in § 544.201 apply to services performed in the U.S. or by U.S. persons. The WMDPSR and the SDN listing have the effect of preventing U.S. persons from providing any financial or other services to a person or entity on the SDN list, *see* 31 C.F.R. § 544.405(b).

28.    On August 11, 2009, OFAC designated KKBC pursuant to E.O. 13382 as an SDN in connection with the proliferation of weapons of mass destruction, thereby subjecting KKBC to the prohibitions contained in 31 C.F.R. Part 544, Subpart B.

29.    At no time before or after that designation did KKBC apply for, receive, or possess a license or authorization from OFAC to engage in any transaction or dealings with a U.S. person or within the U.S.

30.    At no time before or after that designation did DHID, MA, ZHOU, HONG, and LUO apply for, receive or possess a license or authorization from OFAC to engage in any transaction or dealings with a U.S. person or within the U.S. on behalf of KKBC or any other designated entity or individual.

31.    Two of the more common types of financial transactions prohibited by IEEPA and its underlying regulations are: (1) transactions by an SDN (or an undesignated person or entity acting on the SDN's behalf) with a U.S. person or company without an OFAC license; and (2) transactions by the SDN (or an undesignated person or entity acting on the SDN's behalf) with a non-U.S.

20

person or company in U.S. dollars that are cleared through correspondent accounts at a U.S.-based financial institution without an OFAC license. The transactions at issue here fall into the latter category.

32.    An interbank, also known as a correspondent bank, is a financial institution that provides services on behalf of another financial institution. It can facilitate wire transfers, conduct business transactions, accept deposits and gather documents on behalf of another financial institution. Correspondent banks are able to support international wire transfers for their customers in a currency that their customers normally do not hold on reserve. Correspondent banks in the U.S. facilitate these wire transfers by allowing foreign banks, located exclusively overseas, to maintain accounts at the correspondent bank in the U.S.

33.    To obtain goods and services in the international market place, as North Korea must, it needs access to U.S. dollars as some international vendors require purchases to be made in U.S. dollars. As a result, North Korean entities, including designated entities such as KKBC, need access to the U.S. financial system.

## FACTUAL ALLEGATIONS

### I.    DHID's Ties to North Korea

34.    At various times, MA has been open about her role in facilitating trade with North Korea. MA began conducting border trade with the DPRK in approximately 1996 and was successful enough to start her

21

own company, DHID, in the early 2000s. DHID facilitated imports of heavy oil, natural gas, petroleum, flour, and machine pressed noodles. MA has been publicly quoted as explaining, in Mandarin,[1] that her DPRK "customers belong to the DPRK elite group and hold posts at an important enterprise equivalent to the China Oil Corporation, the name of which is not to be disclosed."

35. Following the KKBC's designation as an SDN by the U.S. Department of the Treasury in August 2009, DHID began working to find ways to conduct trade on behalf of KKBC despite the U.S. sanctions. One means of doing so was to use Chinese currency rather than U.S. dollars to conduct commodities transactions, so as to avoid sending money through the U.S. in violation of IEEPA. In July 2010, the City of Dandong, China highlighted press reports of a pilot program between DHID and KKBC to allow Chinese Renminbi (RMB) transactions to facilitate trade between China and North Korea.

36. North Korea's trading needs, however, cannot be met using only Chinese currency. As a result, KKBC has continued to access the U.S. financial system to facilitate the purchase of goods in violation of U.S. sanctions. KKBC has done so by using DHID and its front companies. DHID's U.S. interbank remittance transactions at Standard Chartered Bank alone increased from $1.3 million for the approximately three-year period

---

[1] All quotations in this complaint that are translated from Mandarin into English are identified as such.

22

prior to KKBC's designation to $110 million from 2009 to 2015, after KKBC
was designated.

37.     A company PowerPoint presentation attached to an email from
a DHID employee to MA and ZHOU (the "DHID Presentation"), described
DHID, in Mandarin, as "an enterprise that conducts [S]ino-North Korean
import and export business," and as a business that "has a ten year history
of conducting business with North Korea." It was further described as
having had "a trading value of 250 million U.S. dollars in 2010," which,
according to the presentation, accounted for "more than 20% of total
trading volume" between China and North Korea at that time. The DHID
presentation listed DHID's customers as "1) [c]ompanies affiliated with the
North Korean Government" who control the purchase of bulk goods and
equipment, 2) "North Korean representatives [who] permanently reside in
China" who were sent to China by DPRK companies to make their own
purchase orders, "3) China Commerce Department bidding projects to aid
North Korea," and 4) small companies or individuals who do not have a
license to import/export on their own, or need to use DHID to get a "better
purchase price."

38.     Elsewhere in the document, the DPRK is described as DHID's
primary customer. The presentation further states, in Mandarin, that DHID
"selects companies [that are] subsidiary to [the] Pyongyang Government and
North Korean representatives [who] reside in China." The document also
contained information indicating that from 2009-2011, DHID's export

volume to North Korea increased 30% annually and would likely increase by more than 10% in the future.

39.     Most significantly, under the title of "Disadvantages," the DHID Presentation acknowledges in Mandarin that "business risks come with sensitive North Korean situation."

## II.     DHID's Post-Designation Relationship with KKBC

40.     As a result of its designation in August 2009, KKBC lost its ability to access the U.S. financial system for the purpose of conducting financial transactions in U.S. dollars. To continue business in U.S. dollars and to evade detection of its illicit financial transactions, KKBC used DHID and certain of its front companies to hide its financial transactions.

41.     Following the August 2009 designation of KKBC as an SDN, DHID began making remittances to effect U.S. dollar transactions for the sale or purchase of goods by North Korean entities on behalf of KKBC almost immediately and such remittances grew significantly over time. DHID also maintained a bank account at KKBC.

42.     KKBC bank statements written primarily in Korean for the time period from May 1, 2015 through June 5, 2015, and for the time period from August 1, 2015 through September 11, 2015, show U.S.-dollar denominated transactions between KKBC and DHID. The statements were in the possession of DHID employees, and included deposits, withdrawals, and account balances. Some of the transaction descriptions contained on these

statements pertain to the sale and/or purchase of a variety of goods including urea, anthracite coal, shipping fees, pesticides, vehicles, and general supplies. These statements appeared to serve as a type of ledger system between KKBC and DHID. This ledger system allowed KKBC to keep track of its U.S. dollar transactions effected through DHID. Further, this ledger system allowed KKBC to settle its outstanding balances with DHID without transmitting any funds in U.S. dollars through the U.S. financial system—where such funds would be blocked because KKBC is an SDN.

43.    Specifically, the statements reference a bank account ending in #5602, a U.S.-dollar bank account in the name of DHID held by a KKBC branch in Pyongyang, North Korea. Upon information and belief, the account was used for the purpose of funding DHID for later commodity purchases made by DHID-controlled front companies using the U.S. dollars.

44.    While the bank statement line items often reference U.S.-dollar transfers related to shipping expenses, port fees, and payments from specific trade companies, some of the line items reference specific products such as urea fertilizer, pesticides, coal, chemicals and other general supplies. Most of the deposits that appear on the statements provide line item explanations. Such explanations provide specific detail regarding the source of the funds, including a specific trading company or a specific product linked to a specific deposit. Many of the deposit notations correspond to a separate line item indicating that funds were withdrawn by DHID around the time of a

25

corresponding deposit. The withdrawal amounts are frequently identical to the noted deposits, consistent with DHID being funded by KKBC to make specific commodity purchases.

45.     During these two separate time periods—from May 1, 2015 through June 5, 2015, and from August 1, 2015 through September 11, 2015—a total of $11,127,580.60 was remitted to DHID through this KKBC account. Of this total, approximately $8,324,067.00 appear on these statements as cash withdrawals to DHID, and $2,803,513.60 appear as wire transfers to DHID.

## III.     DHID's Acquisition of Front Companies

46.     To evade U.S. financial sanctions against North Korea and to launder the proceeds of illicit U.S.-dollar financial transactions, DHID created or acquired a series of front companies. DHID used these front companies to conceal from U.S. banks the financial involvement of KKBC and other designated entities in various commodities transactions. Because the illicit financial transactions were conducted in the name of a DHID-affiliated front company, it would appear to the U.S. correspondent bank, for example, that a BVI or Hong Kong-based trading company was sending U.S. dollars to a non-sanctioned commodity or goods trader outside the U.S., when in fact, KKBC or another designated entity was actually funding or guaranteeing the financial transaction. With KKBC's involvement in the illicit transactions hidden behind DHID's front companies, such illicit transactions could then be transmitted

through the U.S. correspondent banks without detection by the U.S. banks' internal compliance systems, which block transactions involving SDNs.

47.   DHID, through its employees MA, ZHOU, LUO, and HONG, used at least 22 different front companies to engage in U.S. dollar transactions on behalf, or for the benefit of, DHID.  Several of the front companies were created or acquired soon after KKBC's designation in August 2009, and others were created or acquired over time as DHID's U.S.-dollar transactions grew.  DHID and its executives and employees established bank accounts in the name of the respective front companies at various banks in China.  These Chinese banks maintained U.S. correspondent bank accounts at several U.S. banks.

48.   For most of these 22 front companies, DHID and its executives, or individuals close to them, were listed as the CEOs and/or directors and/or sole shareholders.[2]  The 22 front companies then served as DHID's alter egos.  As set forth in greater detail below, many of the front companies shared the same addresses.  Moreover, further investigation of those addresses revealed that no real business operations appeared to be taking place at these locations.

49.   There appears to be no legitimate business reason for DHID to undertake the effort and expense of setting up this network of front companies to transact business in U.S. dollars, other than to prevent its transactions in violation of U.S. sanctions s from being detected

## A.   *BVI and Seychelles Front Companies*

---

[2] The documents obtained as part of this investigation frequently use the terms "director" and "CEO" interchangeably with regard to the front companies.

27

50. DHID's general manager, Zhou Jianshu (ZHOU), established or acquired most of the front companies. ZHOU oversaw the shipping logistics and payments for certain urea transactions that were funded or guaranteed by KKBC in violation of IEEPA. ZHOU sent and received several emails from two representatives of a Panama-based law firm regarding eight DHID front companies based in the BVI and Seychelles that show that ZHOU understood the implications of economic sanctions targeting North Korea:

> a. On June 20, 2011, ZHOU received an email from Individual A at the Panama-based law firm in which Individual A says that due to international sanctions, banks do not allow companies with North Korean stockholders or CEOs to open bank accounts. Individual A asked ZHOU to plan well before setting up companies. ZHOU responded on June 22, 2011, saying that he would like to set up six companies; ZHOU asked Individual A to provide company names of several companies for consideration. Individual A provided the names of several shelf companies[3] in British Anguilla, the BVI, the Seychelles, and Samoa, along with their dates of incorporation.
>
> b. Through July 4, 2011, ZHOU exchanged emails with Individual A in which he established or acquired five companies in total. Two of

---

3 "Shelf company," as the term is used in this complaint, is a company that has been previously incorporated prior to its acquisition by a third party. A shelf company is a specific type of front company that is ready for purchase and immediate use "off the shelf" without needing to incorporate it.

28

those companies were BVI-based companies, Success Target Group Ltd. and Best Famous Ltd., and Zhou identified DHID financial manager Luo Chuanxu (LUO) as the CEO and shareholder for both BVI-based companies. As set out below in paragraphs 69-75, Success Target Group, Ltd., is one of the companies through which DHID made transactions through the U.S. financial system on behalf of KKBC in violation of IEEPA.

c. ZHOU also established or acquired three Seychelles-based companies, Sky Bright Development Ltd.,[4] Go Tech Investment Ltd., and Unique One Development Ltd. ZHOU identified the shareholder and CEO for Sky Bright as DHID CEO and majority owner MA; he identified the shareholder and CEO for Go Tech Investment Ltd. and Unique One Development Ltd. as an individual, who is a relative of MA's and DHID employee.

d. To register the BVI and Seychelles front companies, Individual A asked ZHOU to submit payments of 7,500 Chinese RMB (approximately $1,122.00) for each company. The total amount to establish the two BVI-based companies and the two Seychelles-based companies that conducted financial transactions through the U.S. was 30,000 RMB (approximately $4,488.00).

---

[4] Sky Bright Development, Ltd., is registered to MA, but is not one of the 22 DHID front companies that Plaintiff alleges has conducted financial transactions through the United States.

e. In April 2015, several years after ZHOU initially set up the front
companies, Individual B, an employee of the Panama-based law
firm, emailed ZHOU to inform him that his company membership
fees were due. Individual B provided a list of five BVI-based
companies and three Seychelles-based companies that, as
identified by Individual B, ZHOU's "company" [DHID] had
registered. The five BVI-based companies were Poly Advance
Development Ltd.,[5] Success Target Ltd., Best Famous Trading Ltd.,
Sheen Fair Trading Ltd., and Fully Max Trading Ltd. The three
Seychelles-based companies were Unique One Development Ltd.,
Go Tech Investment Ltd., and Sky Bright Development Ltd. The
membership fees for each of the BVI-based companies, as
indicated by Individual B, were $1,016.00 per company. The
membership fees for the Seychelles-based companies were $887.00
per company. The total fees for the four BVI-based companies and
two Seychelles-based companies that conducted financial
transactions through the U.S. were $5,838.00.

51.     The BVI-based companies share the same registration address:
Akara Bldg., 24 De Castro Street, Wickhams Cay I, Road Town, Tortola, BVI.
This address has also been identified by the U.S. Department of the Treasury
as the address for DCB Finance Limited, a front company for North Korean

[5] Poly Advanced Development, Ltd., is registered to HONG, but is not one of the 22 DHID front
companies that Plaintiff alleges has conducted financial transactions through the United
States.

30

Daedong Credit Bank. Both entities were designated as SDNs by the Department of the Treasury on June 27, 2013, pursuant to E.O. 13382.

52.     Upon information and belief, the Seychelles-based company, Unique One Development Limited's registered address, Suite 13, First Floor, Oliaji Trade Centre, Francis Rachel Street, Victoria, Mahe, Republic of Seychelles, is the same address as a Panama-based law firm that assisted DHID and its executives in creating or acquiring Unique One Development Limited and other front companies.

## B.     Hong Kong Front Companies

53.     In January 2011, ZHOU exchanged emails with an individual in Hong Kong who appears to be a broker for established shelf companies registered in Hong Kong. From an email attachment listing 26 company names, ZHOU indicated his preference for seven companies that were incorporated in Hong Kong. ZHOU identified who should be listed as the director of each. Of the seven companies, ZHOU requested that the director for all seven be a known DHID employee. Additionally, ZHOU sent the Hong Kong shelf company broker copies of Chinese identification cards for himself, LUO, HONG, and two other DHID employees.

54.     Two of the seven Hong Kong-based front companies acquired in or around January 2011, Flying Horse (HK) Ltd., registered to a DHID employee, and Beauty Chance (HK) Ltd., registered to LUO, have transmitted U.S. dollars through the U.S. Both of these companies appear to have been incorporated

31

before ZHOU acquired them through the Hong Kong broker in January 2011, suggesting that these entities were shelf companies.

55. In addition to the two Hong Kong-based front companies named above, company registration documents from public databases obtained during the course of this investigation identified 11 other Hong Kong-based businesses described above that have DHID employees as their directors, including individuals who are MA's relatives and DHID employees. Of the 13 (total) Hong Kong-based companies, all but two share the same address as the Hong Kong-based companies identified above: Room 1502, 15/F, Keen Hung Commercial Building, 80 Queen's Road East, Wanchai, Hong Kong. 80 Queen's Road East is a 24-story commercial building located in Wanchai, a popular area of Hong Kong. The building is accessible through a narrow hall where one guard maintains a small desk near two elevators. A directory in the building lists Suite 1502 as occupied by "C.Y. Li & Company." Suite 1502 had an ornament hanging on the door and a name plate on the wall identifying the occupant as "C.Y. Li & Company."

## C. *Wales, England, and Anguilla Companies*

56. Blue Sea Business Co. Ltd.'s director and/or CEO is MA and is incorporated at LA Bldg, 66 Corporation Road, Cardiff, S Glam CF11 7AW, Wales. Blue Sea Business Co. Ltd.'s registered address is a nondescript walk-up apartment with no signage and no exterior number. Moreover, public database information shows that this same address is the incorporation address for thousands of other companies. As set out below in paragraphs 67-

32

68, Blue Sea is one of the front companies through which DHID made transactions through the U.S. financial system on behalf of KKBC in violation of IEEPA.

57.    Carbuncle Business Co. Ltd.'s director and/or CEO is MA and is incorporated at 18A Lanchester Way, Daventry, Northants NN11 8PH, England. This address is located in an industrial area with a few small wholesale businesses.  Moreover, public database information indicates that it is the registered address for several private finance and investment funds.  As set out in more detail below in paragraphs 67-68, Carbuncle is one of the front companies through which DHID made transactions through the U.S. financial system on behalf of KKBC in violation of IEEPA.

58.    Deep Wealth Limited appears to be managed by LUO.  She has received SWIFT message statements directly to her email address from China Merchants Bank pertaining to U.S. dollar transfers from Deep Wealth.  The address for Deep Wealth, according to the captured SWIFT messages, is 25 Mason Complex Stoney Ground the Valley, Anguilla.  This address is a registered office of a Panamanian law firm in Anguilla.

## IV.   Transactions in Violation of IEEPA and Money Laundering Laws

### A.    *2009 Sugar Commodity Transactions Guaranteed by KKBC*

59.    In December 2009, the KKBC branch office in Dandong contracted with DHID to be a third-party payer on a $6.85 million contract to

purchase refined sugar using U.S. dollars. On the contract, DHID is identified as "the agent of the North Korean party."

60. On December 1, 2009, ZHOU received an email from a Commercial Counselor with the DPRK Embassy in Beijing that contained the subject line "Urgent." The email contained two attachments with the filenames "Third-party payer contract.docx" and "Korea Kwangson Bank Dandong Representative Office.docx." Both documents were written in Korean. The Commercial Counselor requested the documents be given to "CEO MA."

61. The first document (the "Guarantee"), titled "Korea Kwangson Bank Dandong Representative Office.docx" contained references to DHID's role in the transaction as "the agent of the North Korean party" for a contract "guaranteed" by KKBC and states "guarantee of payment" at the top of the document.

62. The second document (the "Contract") contained references for the contract between a North Korean trading company and a Canadian company.

63. According to the Guarantee, KKBC's Dandong Representative Office would pay DHID $6,850,000.00 to guarantee the Canadian company's payments. Once DHID received the guarantee payment from KKBC, DHID would make the payment on behalf of the North Korean trading company.

64.     The other attachment to the December 1, 2009 email (the
Contract) contained the title "Third-party payer contract," and outlined the
specific contract obligations to be undertaken by DHID related to the payment
to the Canadian company.  The Contract provided for a 10% commission to
DHID.  The Contract also showed that KKBC's Dandong branch office was
managing DHID's proxy role with KKBC.  While KKBC agreed to pay DHID
$6,850,000.00, the Contract specified that DHID would only pay the Canadian
company $5,887,500.00—approximately 86% of the total amount guaranteed
to DHID.  The additional 14% was likely intended to cover DHID's 10%
commission, shipping fees and other expenses related to the transaction with
the Canadian company.  As a result, the remaining 14% presumably remained
at DHID's accounts in China.

## B.    2009 Purchase of Urea Fertilizer through DHID Front Companies

65.     On September 10, 2009, ZHOU sent an email to a representative
of a North Korean trading company.  The email requested payment for 17,700
metric tons of urea fertilizer that had shipped in June 2009.  ZHOU identified
the contract as CH-HX-2009UR0608, and included the following table[6]
documenting the shipment details, bill of lading date, and total cost for the
fertilizer:

| Ship Name | B/L Date | Confirmed Quantity | Unit Price | Total Price | Payment Due |
|---|---|---|---|---|---|
| CHOPOL2 | 2009/06/20 | 12,190.900MT | US$405/MT | US $4,937,314.50 | 2009/09/20 |

[6] The name of the North Korean trading company has been removed.

35

| HAE SONG | 2009/06/20 | 1,008.855MT | US$405/MT | US $408,586.28 | 2009/09/20 |
| SUN SHINE | 2009/06/23 | 4,500.245MT | US$405/MT | US $1,822,599.22 | 2009/09/23 |
| TOTAL | | 17,700.000MT | | US $7,168,500.00 | |

66.   The table above shows that the trading company owed DHID
$7,168,500.00 on the contract. One month later, on October 13, 2009, ZHOU
sent an email to the North Korean trading company's representative, copying
the Commercial Counselor of the DPRK embassy in Beijing, as a notification
that DHID had received $4,168,500.00 for contract CH-HX-2009UR0608.
ZHOU noted that the payment was received from the "KKBC Dandong office,"
and indicated that the remaining balance due was $3,000,000.00. On
November 12, 2009, a follow up email from ZHOU included a letter that was
carbon copied to the DPRK embassy in Beijing and indicated that KKBC
submitted the final payment of $3,000,000.00 to DHID for contract CH-HX-
2009UR0608.

67.   KKBC funded DHID directly to pay for the fertilizer purchases that
were shipped to North Korea in June 2009. The U.S. dollars provided by
KKBC transacted through the U.S. correspondent bank accounts to pay a
Singapore-based urea fertilizer supplier ("Singapore Distributor"), and were
paid in seven installments totaling $3,494,500.00 between December 4, 2009
and January 6, 2010. These seven payments to the Singapore Distributor
were made by two DHID controlled front companies – Carbuncle Business Co.

36

Ltd. ("Carbuncle") and Blue Sea Business Co. Ltd. ("Blue Sea") – from

accounts listed above that contain defendant property. Of the seven

payments, at least five can be traced through the U.S. financial system. A

chronological summary of the transactions is presented below:

- On December 4, 2009, Shanghai Pudong Development Bank
  confirmed to LUO that the fertilizer supplier was paid $500,000.00
  from Carbuncle's account at Shanghai Pudong Development Bank.
  The transaction identifies a bank account for the Singapore
  Distributor with a bank in Singapore as the recipient.

- On December 9, 2009, a payment in the amount of $500,000.00
  was made to the Singapore Distributor from Blue Sea's account at
  China Merchants Bank in Shenzhen, China. The transaction
  records show the Singapore Distributor's bank account in
  Singapore as being the recipient. The payment was transacted
  through China Merchants Bank's interbank account at Deutsche
  Bank AG and another U.S. interbank account.

- On December 11, 2009, a payment in the amount of $500,000.00
  was made to the Singapore Distributor from Blue Sea's account at
  China Merchants Bank in Shenzhen, China. The transaction
  records show the Singapore Distributor's bank account in
  Singapore as being the recipient. The payment was transacted
  through China Merchants Bank's interbank account at Deutsche
  Bank AG and another U.S. interbank account.

- On December 15, 2009, a payment in the amount of $494,500.00
  was made to the Singapore Distributor from Blue Sea's account at
  China Merchants Bank in Shenzhen, China. The transaction
  records show the Singapore Distributor's bank account in
  Singapore as being the recipient. The payment was transacted
  through China Merchants Bank's interbank account at Deutsche
  Bank AG and another U.S. interbank account.

- On December 17, 2009, a payment in the amount of $500,000.00
  was made to the Singapore Distributor from Blue Sea's account at
  China Merchants Bank in Shenzhen, China. The transaction
  records show the Singapore Distributor's bank account in
  Singapore as being the recipient. The payment was transacted
  through China Merchants Bank's interbank account at Deutsche
  Bank AG and another U.S. interbank account.

- On January 6, 2010, a payment in the amount of $250,000.00 was made to the Singapore Distributor from Blue Sea's account at China Merchants Bank in Shenzhen, China. The transaction records show the Singapore Distributor's bank account in Singapore as being the recipient. The payment was transacted through China Merchants Bank's interbank account at Deutsche Bank AG and another U.S. interbank account.

- On January 6, 2010, Shanghai Pudong Development Bank confirmed to LUO that the Singapore Distributor was paid $750,000.00 from Carbuncle's account at Shanghai Pudong Development Bank. The transaction identifies a bank account for the Singapore Distributor with a bank in Singapore as the recipient after it appeared to be wired through a U.S. interbank account.

68.     While DHID front companies Blue Sea and Carbuncle made the final payments to the Singapore Distributor, as described above, bank records show that DHID funded Blue Sea during the same time period that Blue Sea and Carbuncle paid the Singapore Distributor. From December 1, 2009, through January 15, 2010, DHID made five payments in the form of wire transactions from its defendant property accounts at Agricultural Bank of China to Blue Sea's bank accounts at China Merchants bank, totaling $3,463,441.64. These Blue Sea accounts are also defendant property accounts. Each of the five wire transfers from DHID to Blue Sea (totaling $3,463,441.64) were moved through the two Chinese correspondent banking accounts in the U.S. maintained at Standard Chartered Bank. Each of the five wire transfers included a message for each payment referencing payments made for trade. Each of these wire transfers were processed through Standard Chartered Bank's operations center in Newark, New Jersey.

## C. *2012 Purchase of Urea Fertilizer through DHID Front Companies*

69.    On December 25, 2011, ZHOU sent an email to a representative of the North Korean trading company containing an offer to sell the North Korean trading company 6,000 metric tons of urea fertilizer. The offer to sell the urea fertilizer was under an agreement that KKBC would provide a 30-day unconditional guarantee letter to support the purchase. In a subsequent email sent by ZHOU on January 7, 2012, ZHOU explained that he would require KKBC's guarantee letter before January 9, 2012 in order to perform on the contract.

70.    In furtherance of this transaction, emails sent between December 2011 and February 2012 show that ZHOU and LUO communicated with two urea distributors, a China-based urea distributor ("Chinese Distributor") and a Singapore-based urea distributor ("Singapore Distributor"). The emails discussed the purchases of 3,000 metric tons of urea from each distributor.

71.    Contained in these email exchanges was a contract dated December 5, 2011 in which the Chinese Distributor specified that the contract was for the purchase of approximately 3,000 metric tons of urea between the Chinese Distributor and one of DHID's front companies, Fanwell Limited ("Fanwell"). By the terms of the contract, Fanwell agreed to pay the Chinese distributor $425.00 per metric ton of urea fertilizer for a total cost of $1,275,000.00, of which 80% (approximately $1,014,163.90), by the terms of the contract, was to be paid prior to shipment. The contract required that the

39

fertilizer would be delivered using 9.5 kg bags, totaling approximately 3,000 metric tons. The fertilizer would ship from Qingdao Port, China. The bill of lading associated with the contract for the approximately 3,000 metric tons of urea fertilizer listed the seller as DHID, and the buyer as the North Korean trading company. The commercial invoice showed that the trading company paid DHID $550.00 per metric ton for a total of $1,642,447.40. The commercial invoice also showed that the fertilizer shipped via the maritime vessel Pole Star 1, and was destined for the Nampo Port, DPRK. The commercial invoice and packing list were both stamped with the signature of DHID General Manager MA.

72.    DHID secured the remaining 3,000 metric tons of urea fertilizer on the contract with the Singapore Distributor at a purchase price for $425.00 per metric ton, for a total of $1,275,002.125. Under this contract, the fertilizer would be shipped via the Man Chung 1 vessel. The invoice listed the seller as Singapore Distributor, the buyer as DHID, and listed the North Korean trading company in the "Notify" section of the invoice.  The bill of lading confirmed that the fertilizer was shipped from Dalian Port, China, and was destined for Nampo Port, DPRK. The trading company paid DHID $550.00 per metric ton for 3,000.005 metric tons, totaling $1,650,002.75. The invoice and packing list were stamped with the signature of DHID General Manager MA.

73.     The difference in the purchase price paid by DHID and the price

charged to the North Korean trading company was $125.00 per metric ton,

which represents a profit to DHID on this contract of $750,000.00. This profit

to DHID comprises approximately 22% of the value of the contract price -

such an inflated profit or mark-up is consistent with the legal risk DHID took

on these kinds of transactions.

74.     DHID front companies Fanwell Limited and Success Target

Group, Ltd., paid the Chinese and Singapore Distributors the agreed-upon

price for the urea, and both of these payments were made through China

Merchants Bank, including Fanwell Limited's defendant property accounts,

and transacted through China Merchants Bank's U.S. correspondent bank

accounts. A more detailed tracing of the funds related to the 6,000 metric ton

order is set forth below:

- On January 16, 2012, a payment of $1,014,163.90 to China
  Distributor from Success Target Group, Ltd. was made by China
  Merchants Bank via China Merchants bank's interbank account in
  the U.S.

- On February 10, 2012, a payment of $1,147,502.13 to Singapore
  Distributor from Fanwell was made by China Merchants Bank to
  Singapore Distributor's account in Singapore. The payment was
  transacted through China Merchants Bank's interbank account at
  Deutsche Bank AG and another bank in the U.S.

75.     Bank records show that DHID used several accounts maintained

at a number of Chinese banks in China in order to fund the payments to the

distributors for the above transactions. Specifically, DHID made 38 payments

to Fanwell that were deposited into Fanwell's defendant property accounts, for

41

a total of $40.5 million between July 16, 2010 and July 20, 2012. While Fanwell was identified as the remitter of the payment made to the Singapore Distributor on February 10, 2012, DHID was funding Fanwell to make payments on DHID's behalf. DHID's payments to Fanwell during that time were transacted through the U.S. financial system.

## D.   *2013 Urea Fertilizer Transaction through DHID Front Companies*

76.   On March 6, 2013, ZHOU sent an email that included a quote by DHID for 20,000 metric tons of urea for the North Korean trading company. Under the terms of the agreement, DHID agreed to sell the company 20,000 tons of urea packaged in 50-kilogram bags to be shipped from a port in China at the price of $480.00 per metric ton. The contract's terms further specified that the offer would be valid until March 10, 2013. The offer also stated that DHID must receive the guarantee from KKBC that the funds have been deposited by the trading company before loading the cargo.

77.   Approximately two weeks later, on March 22, 2013, ZHOU sent an email that contained a finalized contract. In this email, ZHOU stated that the delivery of the 20,000 metric tons of urea would be completed within 30 days after "deposit to KKBC is completed."

78.   During this same time period, Hongxiang Industrial Development (H.K.) Limited, a DHID-controlled front company, arranged for 10,000 metric tons of urea to be purchased from the Singapore Distributer. Bank records show that Fully Max Trading Limited ("Fully Max"), another DHID controlled

42

front company, paid the Singapore Distributer $3,889,388.00, in a series of seven installments between May 8, 2013 and June 18, 2013. All payments transited through the U.S. financial system and were drawn on one of the defendant property bank accounts. During this same time period, from May 6, 2013 through June 21, 2013, bank records show Fully Max received a deposit of $4,835,530.00 into its defendant property bank account at China Merchants Bank from a DHID account that is one of the DHID defendant property bank accounts. These funds transited the U.S. financial system through a U.S. correspondent banking account at Standard Chartered Bank.

## V.    Transactions to and from the DHID Defendant Property Accounts

79.    From the time of KKBC's designation in August 2009 through the present, the DHID defendant property accounts at Agriculture Bank of China, Bank of Communications, Bank of Dandong, China Construction Bank, China Merchants Bank, Guangdong Development Bank, and Industrial and Commercial Bank of China received at least $74,377,708.00, which transited through the U.S., including $15,631,152.96 from DHID front companies, approximately $4,500,000.00 of which was from the five front companies that conducted the specific illegal transactions set out above.

80.    In addition, the DHID bank accounts at Bank of Dalian, Bank of Jinzhou, and Hua Xia Bank funded more than $75 million in transfers through the U.S. financial system, including more than $20 million to the five front companies that conducted the specific illegal transactions set out above. The accounts at these three banks were directly involved in the IEEPA and

43

money laundering conspiracy and are among those that stand behind the front company banks, making the scheme to violate United States sanctions possible.

## VI.     Other Evidence of IEEPA and Money Laundering Violations

### A.     *North Korean Coal Sales Funding the DHID Entities*

81.     North Korea relies heavily on coal sales to fund its international trade. Coal generated $970 million in revenue for the DPRK in 2015. Upon information and belief, some of the proceeds from these sales are then used to fund purchases in violation of IEEPA and U.S. money laundering laws.

82.     In May 2013, DHID was in possession of a spreadsheet titled "anthracite data." This spreadsheet summarized North Korean anthracite coal shipping transactions during a four-month period between January 2013 and April 2013. The spreadsheet identifies North Korean companies that serve as fronts for specific North Korean government agencies. Several of the North Korean government agencies that appear on this document were designated by OFAC both before and after 2013, the date that appears on the spreadsheet. Certain companies that appear on this spreadsheet including Dae Song Trading Corporation, the Reconnaissance General Bureau, the Worker's Party of Korea and the National Defense Commission were designated by OFAC before 2013.

83. Pursuant to E.O. 13551,[7] on November 18, 2010, North Korea Dae Song Trading Corporation was designated by the U.S. Department of the Treasury and added to OFAC's SDN list "for being owned or controlled by Office 39 of the Korean Workers' Party." Office 39 has been identified by the U.S. government as a secretive branch of the DPRK Government that provides critical support to the North Korean leadership in part through engaging in illicit economic activities, managing slush funds and generating revenues for the leadership. The spreadsheet reflects this connection because it notes "Korea Dae Song Trading Corporation" "Formerly [known (sic)] as North Korea Office 39."

84. The spreadsheet also contains information about anthracite coal sales between several North Korean entities and Chinese purchasers for the period from January 4, 2013 to April 28, 2013, and provides, among other information for these transactions, coal sale quantities, transportation methods, ports of departure, ports of lading, and places of origin. According to information contained in the spreadsheet, Corporation A, a Chinese company, brokered sales for the purchase of anthracite coal from North Korea and purchased approximately 439,000 tons of anthracite coal from various

---

[7] E.O. 13551 of August 30, 2010, "Blocking Property of Certain Persons with Respect to North Korea", was issued pursuant to IEEPA and targets for sanctions individuals and entities facilitating North Korean trafficking in arms and related materiel; procurement of luxury goods; and engagement in certain illicit economic activities, such as money laundering, the counterfeiting of goods and currency, bulk cash smuggling and narcotics trafficking.

North Korean government agencies, including sanctioned entities, between January 4, 2013 and April 28, 2013.

85.     In addition, the spreadsheet shows that Corporation A purchased 1,091.60 tons of anthracite coal from Korea Dae Song Trading Corporation in January 2013, which would have been at a time when Dae Song Trading Corporation was a designated SDN. This coal was shipped from North Korea and was delivered to "Port of Dandong, China."

86.     Between July 6, 2012 and February 2015, DHID Front Companies received $4,372,178.76 from Corporation A. During this time period, four DHID-controlled front companies, MK Vista Shipping & Business Co. Ltd., Sheen Fair Trading Ltd., Flying Horse (HK) Ltd., and Nice Field International Ltd., received a total of $4,372,178.76 in incoming wire transfers from Corporation A through nine separate wire transactions that transited through correspondent bank accounts in the U.S. The spreadsheet reflects that during this same period, Corporation A was brokering coal sales from Dae Song Trading Corporation, a designated SDN, and other DPRK government agencies.

### B.     *Purchase of Luxury Goods in Violation of U.S. Sanctions*

87.     DHID was also involved in evading U.S. sanctions related to the export of luxury goods to North Korea. Although the transactions in which DHID facilitated the export of luxury goods to North Korea are not directly the subject of this forfeiture action, such transactions demonstrate the extent of

DHID's illegal activity. Further, the transactions demonstrate the centrality of evading North Korean sanctions to DHID's business model, and further support Plaintiff's contention that DHID and its front companies are themselves property involved in money laundering.

88. E.O. 13551 of August 30, 2010, "Blocking Property of Certain Persons with Respect to North Korea" specifically targeted purveyors of luxury goods to North Korea and any person involved in money laundering or other illicit activity on the country's behalf. As defined in separate underlying Regulations,[8] "luxury goods" includes cigarettes and alcohol.

89. E.O. 13551 and its underlying Regulations at 31 C.F.R. Part 510 prohibit transactions that evade or avoid or have the purpose of evading or avoiding the luxury goods prohibition to North Korea.

90. Bank records show that Corporation B, a Singapore-based distributor and trading company known to have distributed tobacco products to North Korea on behalf of a large international tobacco company, received more U.S. dollars from DHID than any other entity with which DHID transacted business. Corporation B distributes liquor and other goods that are prohibited from export to North Korea as luxury goods under the Regulations.

91. DHID and its associated front companies served as intermediaries for U.S.-dollar transactions between North Korean-based

---

[8] 15 C.F.R. § 746.4 and Supplement No. 1 to part 746.

entities and entities in non-sanctioned countries, such as Corporation B. The U.S.-dollar payments to Corporation B from DHID and DHID's front companies were made through the U.S. correspondent bank accounts on behalf of the Chinese banks used by DHID and DHID-controlled entities. DHID and fourteen DHID-controlled entities have remitted approximately $132 million through U.S. interbank accounts, to Corporation B's accounts at Overseas China Banking Corporation and United Overseas Bank Ltd. in Singapore since E.O. 13551 was issued.

92.     These transactions appear to be designed to evade or avoid U.S. sanctions targeting North Korea, as DHID could have transacted directly with Corporation B in U.S. dollars because neither party is designated by OFAC or otherwise prohibited from using the U.S. financial system. However, DHID used several of its front companies, including Blue Sea, Unique One Development, and Fanwell Limited, to send the U.S. dollars to Corporation B through the U.S. financial system after E.O. 13551 was issued.

93.     In addition, one of LUO's emails from March 2013 contains attachments suggesting that DHID created false contracts to support the sending of U.S. dollars by DHID to Corporation B. In a March 2013 email, LUO attached an invoice detailing a purchase of over 40,000 metric tons of North Korean coal made by "Hongxiang Industrial Development" from Corporation B. The contract is denominated in U.S. dollars and its overall value is $3,291,042.00. In the same email, an older invoice bearing a 2008

48

date which appears nearly identical to the 2013 invoice was also attached. The 2008 invoice, however, is between Hongxiang Industrial Development and a presumed North Korean trading company. The 2013 invoice was also for the purchase of North Korean coal, but it appears to be between DHID and a possible North Korean trading company, because the invoice directed that the coal was to be loaded in North Korea and shipped to China. Based on the aforementioned description of Corporation B's business activities and the presence of two nearly identical contracts spaced five years apart, the 2013 invoice appears to be a falsified copy of the 2008 invoice in order to justify the large amount of U.S. dollars DHID and its related front companies sent to Corporation B. Rather than specify that the U.S. dollars DHID sent to Corporation B were intended for the purchase of prohibited luxury goods, the invoices provide an alternative rationale for the U.S. dollar payments—that DHID and its front companies purchased North Korean coal from Corporation B.

## CONCLUSION

94.     The conduct set forth in this Complaint establishes that from at least the time of KKBC's designation in August 2009 until the present, DHID, MA, and various DHID employees conspired to establish a sophisticated scheme to evade U.S. sanctions and to launder the property involved in transactions conducted in violation of U.S. sanctions. This scheme included setting up offshore front companies to make it appear as though trade with

various North Korean entities, including SDN KKBC, was with non-DPRK companies. The scheme enabled the co-conspirators to conduct transactions in U.S. dollars in violation of IEEPA and U.S. money laundering laws. Based on the evidence Plaintiff has obtained, it appears that the majority of DHID's business and assets are derived from this sanctions evasion and money laundering scheme. To the extent DHID has obtained other assets not directly associated with this scheme, such assets appear to be comingled with the proceeds derived from IEEPA violations and money laundering offenses.

95. Based upon the above stated facts, the U.S. alleges that the defendant properties were involved in a violation of 18 U.S.C. § 1956(h), a conspiracy to commit money laundering by transporting, transmitting, or transferring a monetary instrument or funds from a place in the U.S. to or through a place outside the U.S. or to a place in the U.S. from or through a place outside the U.S. with the intent to promote the carrying on of a violation of IEEPA, and/or knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of an unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of IEEPA proceeds.

## CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)
### (Property Involved in a Violation of 18 U.S.C. § 1956(h))

96. Plaintiff incorporates by reference paragraphs 1 through 95 above as if fully set forth herein.

97. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of" sections "1956, 1957, or 1960 of this title, or any property traceable to such property" is subject to forfeiture by the United States.

98. It is a violation of 18 U.S.C. § 1956(h) to conspire to commit a violation of 18 U.S.C. § 1956(a)(2)(A).

99. Pursuant to 18 U.S.C. § 1956(a)(2) a person commits money laundering if the person transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds to a place inside the United States from or through a place outside of the United States (i) with the intent to promote the carrying on of specified unlawful activity or (ii) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

100. "Specified unlawful activity" includes, among other things, offenses related to violations of IEEPA.

101. All of the defendants *in rem* are subject to the United States of America forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute

51

property involved in a violation of 18 U.S.C. § 1956(h), a conspiracy to commit

a violation of 18 U.S.C. § 1956(a)(2)(A).

## REQUEST FOR RELIEF

WHEREFORE plaintiff, the United States of America, requests that

judgment be entered in its favor and against the Defendant Property, that

process issue to enforce the forfeiture of the Defendant Property, that all

persons having an interest in the Defendant Property be cited to appear and

show cause why the forfeiture should not be decreed, that this Court decree

forfeiture of the Defendant Property to the United States of America for

disposition according to law, and that this Court grant the Government such

further relief as this Court may deem just and proper, together with the costs

and disbursements in this action.

Dated:  September 26, 2016

Respectfully submitted,

M. KENDALL DAY, Chief
JENNIFER WALLIS, Trial Attorney
MICHAEL PARKER, Trial Attorney
U.S. Department of Justice
Asset Forfeiture and Money
Laundering Section
Criminal Division
1400 New York Avenue, N.W.,
Suite 10100
Washington, D.C. 20530
Telephone:  (202) 514-1263

DAVID LAUFMAN, Chief
CHRISTIAN FORD, Trial Attorney
U.S. Department of Justice
Counterespionage Section

52

National Security Division
600 E Street NW, Room 10813
Washington, D.C. 20530
Telephone: (202) 233-2049


PAUL J. FISHMAN
United States Attorney
for the District of New Jersey


*s/ Sarah Devlin*
By:   BARBARA A. WARD
       SARAH DEVLIN
Assistant United States Attorneys

Counsel for Plaintiff United States of
America

## **VERIFICATION**

I, Richard J. Schmid, a Special Agent for the United States Federal Bureau of Investigation, hereby verify and declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of the United States Federal Bureau of Investigation.

Executed on this _26_ day of September, 2016.

Richard J. Schmid
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 26 day of September, 2016
at Newark, New Jersey:

Jaclyn Wyrwas
Attorney-at-Law of the State of New Jersey